**2022 UT App 137**

## THE UTAH COURT OF APPEALS

FADHIL ABBAS,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20200913-CA
Filed December 8, 2022

Third District Court, West Jordan Department
The Honorable Chelsea Koch
No. 190401992

Fadhil Abbas, Appellant Pro Se

Simarjit S. Gill and Perrin R. Love,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGE RYAN M. HARRIS and SENIOR JUDGE KATE APPLEBY
concurred.[1]

MORTENSEN, Judge:

¶1    Fadhil Abbas received some bad advice from his attorney
(Counsel)—that a jail sentence of less than one year would help
him avoid deportation. After Abbas encountered immigration
troubles as a result of his plea, he filed a petition for post-
conviction relief, contending that Counsel's bad advice motivated
him to accept a plea resulting in his deportation and that he never
would have pled guilty had he known doing so would carry
negative immigration consequences. Because the record shows

---

1. Senior Judge Kate Appleby sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

that Counsel's wrong advice had no effect on Abbas's decision to accept the plea, we affirm.

## BACKGROUND[2]

### *The Conduct and Charges*

¶2      Over about thirty-five days, Abbas, who was then fifty-four years old, engaged in a relationship with fifteen-year-old Sylvia,[3] whom he met in an online forum for selling used goods. After they met, Abbas cultivated the relationship through an online messaging service.

¶3      Many of the messages (which are contained in a 180-page chat log) were relatively innocuous, but Abbas steered some exchanges toward inappropriate subjects aimed at manipulating Sylvia to become romantically involved with him. In addition to Abbas befriending Sylvia by providing a sympathetic ear to listen to her teenage troubles, he delved into more sensitive subjects, such as asking Sylvia about her former boyfriend and their sexual activity, her virginity, and whether she liked sex. Abbas also suggested that he and Sylvia should secretly marry and repeatedly referred to her as "my wife" in the messages.

---

2. This case comes before us in a post-conviction setting, after the district court held an evidentiary hearing. Accordingly, the facts as related hereafter reflect the record from the plea hearing in the criminal case as well as facts established at the evidentiary hearing held in the post-conviction case.

3. A pseudonym.

¶4   In addition to broaching these intimate topics, Abbas initiated a more sordid exchange with Sylvia when the two were discussing their future together:

Abbas: If u re 18 now u r my wife

Sylvia: So what would you do to me

Abbas: Eat u

Sylvia: You can't force me to do something

Abbas: Not by force but u may ask me to do it

Sylvia: Ya and what if I don't want it and you do
        will you just do it to me

Abbas: If u don't want it the[n] it will ha[ve] no taste

Sylvia: Are you going to rape me
        That's what it sounds like you are saying
        you have to be clear with what you say with me
        I'm so confused

Abbas: U know what? I am afraid u will have some
        [ph]obia from doing sex because the boy who rape
        u[4] and it could be permanent complex

Sylvia: What does that mean[?] I want to be with you
        I just don't understand what you are saying

Abbas: Sex is very necessary in life specially between wife
        and husband or gf and bf but it seems u don't care
        about it

---

4. Sylvia had earlier revealed to Abbas that her former boyfriend "made her do things [she] didn't want to do."

> Sylvia: I do care you know what when I am 18 we can get married and you can be my husband and love me in anyway you want

¶5     And in another exchange, Abbas appeared to ask Sylvia for nude photos but retracted the request after Sylvia balked:

> Sylvia: I owe you so much thank you
>
> Abbas: Nudes
>
> Sylvia: I told you no I dont do that
>
> Abbas: No nudes
> Wazs mistake
> No nude i meant
> . . . .
> Don't want that before the 18
> Ok

¶6     On four occasions, Abbas met secretly with Sylvia. During the meetings, Abbas gave Sylvia a cell phone and small gifts (a notebook, a necklace, drawing paper, pens, and candy). The third time they met, Abbas told Sylvia he wanted a kiss, and she pointed to her cheek. Abbas said he wanted a kiss on the lips, leaned in, kissed her on the lips, put his tongue in her mouth, and bit her lip.

¶7     Abbas insisted that Sylvia delete the pictures and messages they exchanged and that they keep their relationship a secret, saying, "[T]he thing is that you [are] still under the age of 17 or 18" and "you . . . know [the] laws here." He also insisted that Sylvia never reveal that she received the cell phone from him.

¶8     But Sylvia didn't stay silent. Abbas's conduct was reported to school officials, who turned the matter over to the police. Officers interviewed Abbas, who admitted to being in contact

with Sylvia but claimed that "he was just pretending, just saying things" in the messages. Abbas further admitted that he had asked Sylvia to marry him, that he had kissed her, that he met her four times, and that he gave her a cell phone and other small items.

¶9     Abbas was charged with one count of enticing a minor, a class A misdemeanor. *See* Utah Code Ann. § 76-4-401(2)(a) (LexisNexis Supp. 2022) ("A person commits enticement of a minor when the person knowingly uses the Internet or text messaging to solicit, seduce, lure, or entice a minor, or to attempt to solicit, seduce, lure, or entice a minor, or another person that the actor believes to be a minor, to engage in any sexual activity which is a violation of state criminal law.").

*The Plea Agreement*

¶10     Abbas retained Counsel to represent him and initially pled not guilty. But Counsel believed that Abbas's actions satisfied the elements of enticing a minor:

> His contacting her and meeting her four times in his car, kissing her with his tongue penetrating her mouth, and asking her about nude pictures and if he can have sex with her and if he can keep her as a girlfriend on the side.

> All these things—and also to keep the relationship secret. They are all part of the sexual activity. If you read the statute, the law is designed to protect minors.

And Counsel went on to express this opinion:

> Any reasonable person looking at all these things happening between a child, a 15-year-old, and a

man of 55-years-old[5] with six children and a wife, would easily infer this is not a charitable relationship, it is designed for sexual activity.

Counsel also revealed that Abbas admitted to him that he had asked Sylvia for nude pictures "a couple of times" and that "[h]e basically wanted [Sylvia as] a girlfriend on the side."

¶11　Contemporaneously, the prosecutor had notified Counsel that Sylvia had provided "additional statements" that could support the charges against Abbas being expanded and "amended to felonies." Counsel testified that he had a "conversation" with Abbas "about those additional disclosures" that Sylvia "was making," but Abbas said he was "already aware" of them and that "they didn't come as a surprise to him." Counsel communicated to Abbas that the charges could be expanded and amended to felonies. In light of these realities, Counsel negotiated a plea agreement with the State in which Abbas would plead guilty to the misdemeanor charge, and the State would agree not to expand the charges to felonies and, in addition, would agree to recommend probation rather than jail time as well as a potential "402 reduction" at the conclusion of the probationary period after the completion of sex offender registration and treatment requirements. See Utah Code Ann. § 76-3-402(8)(a) (LexisNexis Supp. 2022) (allowing reduction to a lower degree of offense under specific circumstances). Subsequently, Abbas decided to accept the plea agreement and change his initial plea.

¶12　On the day of the change-of-plea hearing, the prosecutor initially indicated that she would recommend a 365-day suspended sentence. Counsel advised Abbas to retain an immigration attorney. Abbas refused to take Counsel's advice and instead chose to plead guilty, saying, "No. I need to finish this today. I need to end this because of the immigration reason, and I

---

5. Abbas turned fifty-five shortly after his actions came to light.

am willing to take the classes." Counsel said he believed that Abbas's plan was to plead guilty and "to keep low, take the classes, [and] avoid immigration contact by not going to jail or [getting] arrest[ed]."

¶13   After Abbas agreed to move forward with the proffered agreement, Counsel asked the prosecutor to recommend a 364-day (instead of a 365-day) suspended sentence, believing that if the sentence was for less than one year, Abbas was less likely to be deported. The prosecutor agreed to make—and did make—that recommendation.

¶14   While entering his guilty plea, Abbas assured the court that he understood the English language, did not need an interpreter, and had read the plea documents. The court asked Abbas if he was "thinking clearly" and "under[stood] what [he was] doing," specifically that he was waiving his right to a jury trial. After conducting the plea colloquy, *see* Utah R. Crim. P. 11(e), and receiving the signed agreement, the court found Abbas's "plea [had] been knowing[ly], voluntarily, and intelligently given." The plea form included the following statement: "I understand that if I am not a United States citizen my guilty plea(s) may subject me to deportation."

*Abbas's Petition for Post-conviction Relief*

¶15   Abbas didn't fly under the immigration radar as he had planned. Disliking the imposition of conditions including probation with sex offender status, Abbas, acting pro se, filed a petition for post-conviction relief (PCR petition), alleging, among other things, that he was innocent, lacked "cultural knowledge," was unaware of legal terminology and procedure, was represented by a "weak" lawyer, and was confronted with a prosecutor and police officers who were dishonest and partial "to the other side."

¶16 Shortly thereafter, Abbas's probation officer filed a progress violation report and notified the court that Abbas had not yet initiated sex-offender treatment. An arrest warrant was issued. In October 2019, officers from the U.S. Department of Homeland Security detained Abbas and held him in Colorado.

¶17 In May 2020, now represented by new counsel, Abbas amended his PCR petition to seek additional relief, alleging (1) that his plea was not voluntarily made; (2) that the prosecution failed to turn over exculpatory evidence; and (3) that Counsel rendered ineffective assistance in various ways—(a) giving incorrect immigration advice, (b) failing to include in the record what sexual activity Abbas enticed Sylvia to engage in, (c) failing to obtain the chat log, (d) failing to explain the plea statement and the elements of the offense to Abbas, and (e) failing to view police interview videos of Abbas and Sylvia.

*Ruling on Abbas's PCR Petition*

¶18 The court held a three-day hearing on Abbas's PCR petition, receiving testimony from the investigating detective, Counsel, Abbas, Abbas's friends, and Abbas's wife. The parties also submitted supplemental briefing on applicable immigration statutes.

¶19 The court denied each of Abbas's three claims. It first determined that Abbas had entered his guilty plea knowingly and intelligently. It stated that the sentencing court "performed an adequate colloquy, including ensuring that [Abbas] understood English, had read the plea form, understood all his rights and the consequences of pleading guilty, and had no questions." The court found Abbas's testimony—that he did not know what type of crime he had committed, that he pled guilty only because he was not given an option, and that he signed the plea form because Counsel had pointed with his finger to the bottom of the plea form and told him to sign—"to be not credible." Instead, the court

noted that Abbas had affirmed on the record that he understood everything on the form, that he did not need an interpreter, that he had worked as an English interpreter, and that he had read and understood the plea form. Given this testimony, the court concluded that Abbas had "not shown that he had such an incomplete understanding of the charge that his plea [could not] stand."

¶20 Next, regarding his claim that the prosecution withheld exculpatory evidence by not turning the chat log over to Counsel, the court stated that it was uncertain whether the chat log had been turned over. But as a threshold matter, the court noted that while "the State had a constitutional duty to turn over the chat log, when [Abbas] entered a plea of guilty, he waived any pre-plea constitutional violations." *See Medel v. State*, 2008 UT 32, ¶ 26, 184 P.3d 1226 ("By entering a knowing and voluntary guilty plea, a defendant waives all non-jurisdictional challenges to a conviction. This waiver includes pre-plea constitutional violations." (cleaned up)).

¶21 Moreover, the court concluded that even if the chat log had not been turned over, its discovery by subsequent counsel did not—for several reasons—"constitute newly discovered evidence" that required Abbas's plea to be vacated. First, Counsel knew about the log and could have obtained it through reasonable diligence. Second, the evidence in the chat log was cumulative of chats already outlined in the police report. And third, rather than being exculpatory, "the chat log, when viewed in its entirety, [was] much more inculpatory than even the various excerpts outlined in the police report." As inculpatory elements, the court referred to sections of the chat log concerning nude photos; the purchase of numerous gifts; the secretive provision of a cell phone; conversations about sex, virginity, and a secret marriage; keeping the communications a secret; meeting several times; and kissing. In sum, the court stated that "the 180 page chat log gives light to the fact that [Abbas] not only had a conversation with the

fifteen year old girl about nudes, but that the relationship was much less innocent" than he represented. In fact, the court concluded that "numerous . . . troubling sections" demonstrated "that the chat log, in no way, constituted exculpatory evidence." "Instead," the court asserted, "it provided overwhelming evidence of [Abbas's] guilt" such that "no reasonable trier of fact could have found [Abbas] not guilty with the admission of the chat log." Thus, "any failure to disclose the chat log did not result in prejudice to [Abbas]."

¶22 Lastly, the court concluded that Abbas's ineffective assistance claims failed under the test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). Significant for this appeal, the court found that Counsel performed deficiently in advising Abbas that changing the sentence from 365 to 364 days would have a beneficial effect on potential immigration consequences. While Counsel correctly advised that there could be "severe immigration consequences" for entering a guilty plea, his "representation was deficient" when "he made affirmative material misrepresentations that [Abbas] would not be deported if he were sentenced to 364 days instead of one year." But the court concluded that "despite" Counsel's "deficient performance" in this regard, Abbas had not demonstrated prejudice: "Even if [Abbas's] claims were all valid, he must still show prejudice . . . . Considering all of the evidence, there is not a reasonable likelihood of a more favorable outcome had [Abbas] proceeded to trial."[6]

---

6. Regarding Abbas's claims that Counsel was ineffective in failing to include in the record what sexual activity Abbas enticed Sylvia to engage in and failing to explain the plea statement and the elements of the offense to Abbas, the court concluded that Counsel's performance in these respects, in addition to not resulting in prejudice, was not deficient.

*Abbas's Rule 59 Motion*

¶23    Abbas filed a motion for a new trial, *see* Utah R. Civ. P. 59, asserting that the court applied the incorrect legal standard in determining prejudice when it assessed whether he had shown a likelihood of a better outcome had he proceeded to trial. Rather than a better outcome, Abbas argued that to make a showing of prejudice "in a guilty plea case," a petitioner "must show that but for the deficiency of trial counsel the petitioner would have not pleaded guilty and would have insisted on going to trial and that such a decision would have been rational under the circumstances." (Cleaned up.) *See Ramirez-Gil v. State*, 2014 UT App 122, ¶ 8, 327 P.3d 1228 ("In order to demonstrate prejudice on this type of claim, [a] petitioner must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial and that such a decision would have been rational under the circumstances." (cleaned up)).

¶24    Abbas also argued that because "something more than success at trial was the motivating factor in the plea," he qualified for a "special circumstance" as articulated in *Lee v. United States*, 137 S. Ct. 1958 (2017). Specifically, Abbas argued that "his desire to avoid deportation at all costs" was "a special circumstance." *See Arriaga v. State*, 2020 UT 37, ¶ 35, 469 P.3d 914 (noting that "when a defendant provides substantial and uncontroverted evidence that something other than a more favorable outcome at trial was a determinative issue at the time the plea decision was made," a special circumstance arises in the ineffective assistance of counsel context, meaning a defendant "need not demonstrate a likelihood of success at trial" to establish prejudice).

¶25    The court agreed that it should have applied the prejudice standard advanced by Abbas: because the claim involved entering a plea, "in order to prove there [was] a reasonable likelihood of a more favorable outcome," Abbas needed to show

only "a reasonable probability that, but for the error [of Counsel], he would have not pleaded guilty and insisted on going to trial." *See id.* ¶ 32.

¶26    But even applying this prejudice standard, the court concluded that Abbas "failed to show that but for [Counsel's] advice regarding deportation, he would not have pleaded guilty and would have insisted on going to trial." The court noted,

> Other than [Abbas's] post-conviction, self-serving supposition that he would have gone to trial if he had known he would be deported, there was no other evidence to support that assertion. In fact, the evidence presented directly contradicts this position, including testimony that [Abbas] wanted to proceed with the plea that day to put the case behind him as quickly as possible.

The court also noted that Abbas signed the plea form stating that his plea "may subject [him] to deportation."

¶27    Further, the court rejected Abbas's argument that the exception articulated in *Lee* should apply to him. The court explained that under *Lee*, "'special circumstances' arise *only* when a defendant provides 'substantial and uncontroverted' evidence that something other than a more favorable outcome at trial was a determinative issue at the time the plea decision was made." (Quoting *Lee*, 137 S. Ct. at 1965, 1969.) Specifically, the court said that Abbas had "failed to present substantial and uncontroverted evidence that something other than a more favorable outcome at trial" was determinative of his plea decision. (Cleaned up.) "As such," the court concluded, "the 'special circumstances' exception does not apply in the instant case."

ISSUE AND STANDARDS OF REVIEW

¶28    Abbas argues on appeal that the post-conviction court was incorrect in not applying the exception articulated in *Lee v. United States*, 137 S. Ct. 1958 (2017), for assessing the prejudice from Counsel's deficient performance. "We review an appeal from an order dismissing or denying a petition for post-conviction relief for correctness without deference to the lower court's conclusions of law. Moreover, when confronted with ineffective assistance of counsel claims, we review a lower court's purely factual findings for clear error, but we review the application of the law to the facts for correctness." *Archuleta v. State*, 2020 UT 62, ¶ 20, 472 P.3d 950 (cleaned up).[7]

ANALYSIS

¶29    The question here is whether "but for Counsel's errors, [Abbas] would not have pleaded guilty and would have insisted on going to trial and that such a decision would have been rational under the circumstances." *See Ramirez-Gil v. State*, 2014 UT App 122, ¶ 8, 327 P.3d 1228 (cleaned up). Our supreme court has explained,

---

7. Abbas also included a rule 23B motion for remand in his briefing as his second legal issue for this appeal. In October 2021, this court denied a similar rule 23B motion from Abbas, stating, "By its express terms rule 23B is applicable only in criminal appeals. This appeal is not a direct appeal from a criminal conviction, but instead an appeal from the dismissal of his petition for post-conviction relief. Thus, rule 23B is not applicable to this appeal." Our opinion that a rule 23B remand is inapplicable to post-conviction relief has not changed, and we decline to consider this issue further.

> In limited circumstances, a defendant may rationally reject a plea deal where "special circumstances" suggest that there is more to consider than simply the likelihood of success at trial. And the [Supreme] Court explained that where these "special circumstances" exist, defendants need not demonstrate a likelihood of success at trial. Rather, they need only show that if properly advised, they would have opted to go to trial.

*Arriaga v. State*, 2020 UT 37, ¶ 35, 469 P.3d 914 (cleaned up). Thus, Abbas's argument is that "special circumstances" governed his decision to accept the plea because it was motivated by something other than success at trial, namely, his desire to avoid deportation. In other words, Abbas asserts that Counsel's incorrect advice *caused* him to accept the plea under the mistaken assumption that doing so would allow him to avoid deportation.

¶30 Abbas cites *Lee v. United States*, 137 S. Ct. 1958 (2017), in support of his arguments. But *Lee* is of little help to Abbas. In *Lee*, the Supreme Court explained that a "special circumstance[]" arises when an immigrant-defendant "would not have accepted a plea had he known it would lead to deportation." *Id.* at 1965, 1969. But the Court's explanation is nuanced by a specific condition,

> But for his attorney's incompetence, [the defendant] would have known that accepting the plea agreement would *certainly* lead to deportation. Going to trial? *Almost* certainly. If deportation were the "determinative issue" for an individual in plea discussions, as it was for [the defendant]; if that individual had strong connections to this country and no other, as did [the defendant]; and if the consequences of taking a chance at trial were not markedly harsher than pleading, as in this case, that "almost" could make all the difference.

*Id.* at 1968–69. This was not Abbas's situation. Abbas knew that accepting the plea deal would possibly have immigration consequences, but he was hoping to avoid those consequences by pleading to a misdemeanor, complying with his probation conditions, and keeping a low profile. And he also knew that turning down the plea deal and going to trial would have nearly guaranteed severe consequences—jail time, perhaps for a felony conviction—and additional scrutiny that would make deportation all but a certainty.

¶31 Of course, avoiding deportation was Abbas's ultimate motivation in pleading guilty. But what must be considered here is not so much the macro-motive of avoiding deportation, but the specific mechanism Abbas employed to achieve this end. And that mechanism was to plead guilty to a misdemeanor and avoid a trial. Had he not accepted the plea, he would have gone to trial and almost certainly been convicted of the misdemeanor. And rejecting the offered plea may have opened the door to the State enhancing his charge to include at least one felony. Thus, for Abbas, the motivation for accepting the plea was to achieve a more favorable outcome—largely to avoid the publicity of a trial—which he, in turn, thought would support his immigration aspirations.

¶32 Even absent the possibility of the threatened felony conviction, Abbas still faced a substantial risk in going to trial on the misdemeanor charge. We agree with the district court's assessment that if the State had presented the evidence of the chat log at trial, Abbas would have been convicted on the enticement count—but without the benefits afforded by the plea, namely a suspended sentence of less than one year. Indeed, by taking the plea that essentially consisted of probation accompanied by sex offender treatment, Abbas was able to pursue his strategy of keeping a low profile to avoid the notice of immigration officials, even if the success of that strategic goal was far from certain. Conviction of a misdemeanor with jail time—or, certainly,

conviction of a felony, probably with prison time—would have likely carried far more severe consequences, including immigration issues, than accepting the plea deal. Thus, the plea involving no jail time best suited Abbas's chances, slim though they might have been, to stay out of sight of immigration authorities.

¶33 The defendant in *Lee* faced a choice between a trial that would "almost certainly" result in deportation and a plea that "certainly" would have resulted in deportation. Abbas's choices were the exact inverse. In his situation, choosing to go to trial was the *more likely* of the two options to result in deportation. His choice was between (1) pleading guilty to a misdemeanor, which would lead to deportation if he was ever caught by immigration officials but which might afford him the opportunity to avoid contact with those officials until he could obtain a 402 reduction, and (2) facing prosecution for not only the misdemeanor—for which he was certain to be convicted and deported—but also for unspecified felonies, which would probably include a stay in prison followed by certain deportation. Abbas made a rational choice in opting for the better chance to avoid deportation, narrow though that path was.

¶34 Abbas has presented no evidence that at the time he accepted the plea deal he had any other thought than resolving the matter quickly and avoiding the perils of going to trial. Indeed, Counsel had told Abbas that he would likely face negative immigration consequences if he pled guilty to the misdemeanor charge, but Abbas had set his mind on doing just that. The fact that Abbas had decided to accept the plea agreement even before the prosecutor agreed to a reduced duration of the sentence dispositively indicates that Abbas's acceptance of the plea deal was not reliant on Counsel's bad immigration advice. In other words, there is no indication in the record that the offer of a reduced length of suspended sentence had any effect on Abbas's

decision to accept the plea. Given this circumstance, we fail to see how Counsel's deficient performance prejudiced Abbas.

¶35 We have no trouble concluding that Counsel's error had no effect on Abbas's "decision to plead guilty rather than go to trial." *See Arriaga*, 2020 UT 37, ¶ 32. Abbas appears to have calculated that he had more to lose in going to trial (a misdemeanor conviction or potential felony conviction at trial that would equal deportation) than if he accepted the plea deal of whatever length (a misdemeanor that—in his mind—could allow him to avoid the notice of immigration officials). Only by obtaining a more favorable outcome (that is, pleading guilty to a guaranteed misdemeanor without jail time) did Abbas believe that he might be able to avoid negative immigration consequences. And going to trial just on the misdemeanor charge would have been more likely to draw attention to Abbas. In other words, his primary concern was to receive the least serious conviction and maintain the greatest possible obscurity. By doing so, he thought that his chances of not being deported were better. If he had gone to trial and been convicted of a felony, deportation would have been guaranteed. Even a conviction of a misdemeanor at trial carried a much higher risk. But by accepting the plea to a misdemeanor with the least onerous sentence, deportation was less likely—or at least he thought—because he might be able to fly under the radar. But going to trial carried with it the additional risk of a felony conviction or a misdemeanor conviction with substantial jail time. The bad advice Counsel gave—that the sentence of less than a year would enable Abbas to avoid deportation—had no effect on Abbas's decision because he was already set on accepting the plea as a means to avoid notice by limiting his exposure.

¶36 Abbas has thus failed to show that Counsel's advice regarding deportation had any impact on his decision to plead guilty. Abbas wanted to proceed with the plea because he believed that an expedient resolution afforded by a misdemeanor conviction—even one that raised the possibility of immigration

consequences—was preferable to the extended trial with practically guaranteed immigration entanglements. And because Abbas has not produced any evidence that he would have succeeded at trial—indeed, Abbas's reluctance to go to trial may have been based on his fear that additional disclosures from Sylvia would result in a felony conviction—we conclude that Abbas "has not met his burden of showing it would have been rational to forego his plea deal under the circumstances of his case." *Id.* ¶ 38.

## CONCLUSION

¶37    Abbas's ineffective assistance of counsel claim fails because he cannot show prejudice. He has not demonstrated that he was influenced to take the plea because of Counsel's erroneous advice. Thus, we conclude that the district court properly denied Abbas's PCR petition. Affirmed.

_____